there are two issues in this case and they're very closely related. First issue is whether the defendant was judge improperly found the defendant to have been restored to fitness. And secondly, second issue being whether the judge's subsequent order that the defendant was capable of proceeding pro se was constituted an abuse of discretion. So both these issues are closely related. I intend to speak mostly on the second issue, mostly because both issues rely on the same facts, but the second issue has a few wrinkles of law that I wanted to get to. Facts in this case are discussed at length in the brief, and I don't want to go over all of them because obviously it would take more time than I have. But I do want to make one point that I don't think comes across real well in the briefs, just by the fact that these briefs are obviously summaries and when I'm up here and we're talking about this, we're always summarizing these events. And it's easy to miss just how long these court hearings were. And just where you can see it is in the record sites. And just a couple that I just wanted to point out from my opening brief. On page 7 of my Statement of Facts, I mentioned that the defendant prolonged several early proceedings with soliloquies on various topics involving his wanting to obtain a retainer to hire private counsel and his health problems and his complaints about the jail's treatment of his male. And then the record site for that is SRP 28-192. On page 12, I mentioned the defendant's narrative testimony that the judge allowed him to do. That's SRP 399-437. And then the third one, and you also notice how large these numbers are getting as it goes along, the defendant prolonging another hearing still during the restoration proceedings with another soliloquy and it's SRP 564-594. And then we're at page 594, we're actually barely halfway through the restoration proceedings. The judge's ruling that the defendant was restored to fitness is actually on How many pages was the judge's ruling? It was, I don't know exactly, a couple pages I think. I believe it was four or five. Some of the things that took a lot of time, like the representations that he was going to hire private counsel, was actually substantiated though by the clerks and the clerk called to make sure that was true? In some way. He did, this private counsel existed. The accountant existed. The accountant, however, apparently was not working on releasing funds trust. Counsel apparently believed a trust existed, but wouldn't give anybody any details about the trust. And I think it was the state's attorney, Jamie Boyd, who opined that counsel probably didn't really know about the trust himself. So one of the odd things about this case is there's some strange substantiation of some aspects of these claims. Is there anything that wasn't substantiated? Sure. And the obvious one would be the 1973 meeting with President Nixon. Clearly not substantiated. Also, well, what happens is there's a lot of things that the defendant tries to use to substantiate things that don't really substantiate the things that he wants them to use, or he wants to use them to do. And that's I think a big part of the problem here. For example, the taped telephone conversation that the defendant spent two days of his narrative testimony vehemently fighting to get this in. He plays the tape. He then goes back to jail that night and hand transcribes the entire tape and then reads it into the record the next day. And what is striking is that the tape doesn't prove what he wants it to prove. He wants the tape to prove that the victim's attorney is admitting that the victim owes the defendant money. And it just isn't there. He's actually saying the defendant is harassing my client for money and he's not proving that he owes it and I'm advising him not to pay it. And yet, and there it is, and yet he's, you know, two days the defendant is trying to get this in to have, to prove this. So, and that's, you know, my point is that this is, there's 940 some odd pages of this over the course of nine months. And it's just, and that's just the restoration hearing. If you go back further to the original proceedings, leading to the original finding of unfitness. But that's not an issue here. Well, I think it is, I think it's relevant, I think it is relevant to the question of was he restored to fitness. I mean, it shows that he, he demonstrates the same problems in the original proceedings that are, it shows that nothing changed between the judge finding him unfit. Didn't the jury originally find that he was fit? They did. There was originally a jury finding that he was unfit. That was before he began to talk about President Nixon. And the President Nixon story is what kind of earned him a second fitness hearing and which resulted in him being found unfit. So when you talk about the previous hearings sort of support the fact that he's not restored or hasn't been restored to fitness, which previous proceeding are you talking about? The 2007 proceeding? Correct. The first one that the jury heard and found him fit? Are you asking us to revisit that issue? I'm not asking you to revisit it. I think it's all, all of it goes, all of these facts, all of that evidence, all that testimony from the defendant, from the 2007 proceeding and the subsequent proceeding when he was found unfit, it all demonstrates that he has the same problem. He had the same problem in 2007 all the way up to 2008 and then goes away to Elgin for a year where he's not treated at all. He's treated. He's treated. But the delusions are not part of the treatment plan. Correct, correct. He was there for a year. He was there, but they did not give him his medication, which was his treatment plan. And according to the doctor, he only once in a while showed up at a group therapy session. And I believe on cross-examination, I think the doctor agreed, at least with defense counsel, that he characterized it as he had done basically nothing. If we're allowed to look backwards, as you're suggesting we do, to see this pattern that he has, can't we also look forward then and look at the trial on the merits? What did he do during the trial that demonstrated he wasn't fit? Well, I would certainly, actually, yeah, I would love for you to look at the trial too. The trial is, in my mind, it borders on absurdist performance art. I mean, the trial ends up being a month long for a class 3 death case. But your brief doesn't point out what happened during the trial that was unusual or absurd. Oh, I think it does. He cross-examined the victim for seven days. I pointed that out in the brief. And during that cross-examination, he's saying to the victim, in an effort to get the victim to admit that he really was a member of COOL in the game. He also, I know I pointed this out in the brief, for every witness who had anything to do with the house transaction, he showed that witness the clause in the contract that basically said that Damar, the victim, had to have satisfied any subcontractor liens before the house deal could go through. It was a standard term in a new construction. Every witness said it was, but he continued to try to get somebody to admit or to say that that clause actually had to do with $63,000 of improvements that he claimed that he had told Damar to do, and he claimed were conditioned precedent to him receiving a home loan. And every single witness said, no, that's not what this clause says. It has nothing to do with that. And yet, Mr. Bird persisted. And like I said, that just added up over and over and over again during this trial. And this trial really was a spectacle. Now, the reason I actually didn't talk about it too much in the brief, there is case law that says that there's at least a federal case with respect to the Indiana v. Edwards issue. That's where the federal court actually refuses to consider things that happen after the judge. Which is why I asked you to address it, because you want us to look backwards as well. Right. Well, the reason they wouldn't have let the judge look forward was because the judge can't see forward in time. But the judge can see backwards and can recall what occurred. And certainly, when determining whether somebody is going to be restored to fitness, I think it's important to, it's necessary to consider what it was that led to the finding of unfitness. So I absolutely think it's important for the judge to look at all of it. And really what I wanted to get at with that, too, was that you had 946 pages of transcript from this restoration hearing. You had an additional 900 pages of transcript, again, mostly dealing with fitness, mostly comprising of Mr. Burr talking in the original proceedings. So even just at the point where the judge was making the restoration finding, you had 1,800 pages of evidence, of first-hand evidence of how Mr. Burr was going to act in court. And now getting to the legal issues, I wanted to... Well, the cross-examination of Dr. Naziro, or however you pronounce his name, was effective, wasn't it? He got the expert to change his mind. Well, yeah, but he didn't want the expert to change his mind. He wanted the expert to find him fit. Crazy like a fox, they say. That's what he says. I think the record shows that Mr. Burr wanted him to find fit. And that was Dr. Nazirino's original opinion, was he was fit. And he changed his mind that he was unfit after being cross-examined by him for two days, I believe, two or three days. Also, I would also point out that it wasn't just the defendant's cross-examination of Dr. Nazirino. There was also defense counsel's cross-examination of Dr. Nazirino, where Dr. Nazirino basically was forced to admit that he had done absolutely nothing to treat the defendant. And the defendant was just as delusional on the day that he left Elgin as he was on the day that he entered. That wasn't the reason he changed his opinion, though, based on the treatment plan that didn't occur. It was based on the delusions that the defendant expressed during the cross-examination. Or do you think I'm wrong? I think, actually, you're probably correct, because I think Dr. Nazirino actually said that. He said that you've changed, Samuel, or something to that effect. How did you agree to that? Thank you. Well, I would quickly get, then, to the legal issues of Indiana v. Edwards. Like I said, these facts go to both issues. But the Indiana v. Edwards issue has a few legal wrinkles I wanted to just bring up. First of all, this is new law. Edwards is a 2008 case. For the 33 years up to then, the United States Supreme Court treated this issue as exactly the same as a fitness issue. If you're fit, you can waive counsel. If you weren't, you couldn't. Edwards creates this gray area, and there's not a lot of Illinois law on this subject, but I wanted to talk about two cases real fast that I believe are wrongly decided, and that's Allen v. Tatum from the Illinois Appellate Court, where they held that Edwards was purely permissive and that it could allow a judge to force counsel on a defendant but could not force him to do so. And I would submit that those are wrongly decided, that the right that's protected by Edwards is not judicial convenience. It is the defendant's due process right to a fair trial. And that right is so important that it trumps the defendant's right to conduct his defense as he sees fit. And this goes in— What part of Edwards do you see that? I believe— That composition. You know, I wouldn't give you a page right now, but I believe that the court in Edwards talks specifically about it not being just to have a helpless mentally ill person defending himself. And I think I actually might have quoted that language in my brief, and I can look for it for rebuttal, but I believe that is the basis for Edwards, is the defendant's right to a fair trial. And it falls in line with the cases that I discuss on pages 41 and 42 of my opening brief, Deck and Wheat v. Allen, all cases where a constitutional right to a fair trial trumps the defendant's right to conduct his defense as he sees fit. When the defendant suffers from a severe mental illness. Correct. So where's the severe mental illness in this case? Well, you have two doctors that diagnose him with a delusional disorder and personality disorder. You have one doctor who only diagnosed him with personality disorder. And I would call your attention to Falcone v. State. Is being delusional a mental disorder? I believe it is. And that's where I would call, of course, attention to Falcone v. State. I think it's an important case that's out in Alaska. The Alaskan Supreme Court looks at that phrase, severe mental illness, and holds that it does not necessarily mean a DSM-IV diagnosis. And the defendant in that case had not been diagnosed, or at least it's not mentioned in the opinion, but nevertheless couldn't stop filing strange filings, arguing the Uniform Commercial Code and the Bible prevented his prosecution. And the court in Falcone found that that qualified as a severe mental illness, even without a specific diagnosis. Your time is up. Thank you. I have a question for you. Sure. If the judge had decided the other way on counsel, do you think there would be an issue on appeal? If the judge had gone the Edwards way and said you cannot represent yourself, isn't the trial judge darned if he does and darned if he doesn't? All I would say, in all likelihood, there would be an argument, and Mr. Rod would be on the other side of it, and I would say that I would have much less chance of succeeding. Did the trial judge give the defendant any time limitations, let him know that he wanted the case to move along a little faster, like we do to you here in the appellate court if you hear the warning? Right. Well, comments were made throughout the trial, and I know particularly the state's attorney started to refer to hearings as Mr. Bird's open mic nights and made objections such as, objection, it's 1230 and I want to go to lunch, and Mr. Bird's still talking and things like that. I couldn't point you to a specific one that the judge did. I know that he did during several hearings during the trial as well. The judge at the end of it all commended him for the way he presented his case. He did, he did, but I just think the record speaks otherwise. Because of the page number. I'm sorry? Because of the number of pages. Well, and because of the content on those pages, because I don't think that, the defense that he put up was a giant delusion. The evidence that he tried to bring out didn't prove what he wanted it to prove. And it didn't prove what he thought it proved. And it happened again and again and again through the case. So I don't think, what happened here was not justice. What happened here was a mentally ill man just left on his own to defend this criminal case, and this happened. This very strange, huge time sink happened. And I don't think it was just. And I would ask your honors to grant Mr. Bird a new trial. Any questions? Thank you. Thank you. Any more questions? No. May it please the court? We're not going to tell you to hurry up because lunch is approaching. Oh. There's a couple of interesting aspects of this case, a very interesting case perhaps. One of which is the relief that the defendant is actually seeking is for remand to reverse the restoration of fitness. I would point out, this court can take judicial notice, that Mr. Bird is a free man right now. He's been discharged last week, and he is even free from his MSR. So would the actual request would send him back for a new fitness evaluation and possibly seeking remand to the Department of Human Services. Now, that is, of course, not my call. That's not necessarily counsel's call, but it's something that the court should at least be aware of. The other point is when we're looking back, there was an appeal taken from the finding of unfitness, and that was dismissed by, I believe, the defenders because it was moot, because the defendant was found to be restored to fitness. So he's no longer able to have that issue litigated because of the passage of time. So that's another interesting aspect. Again, I'm not sure what that speaks to here, but I thought I'd at least employ the court of those points. The specific arguments about the judge's findings, we have two, well, several experts at the restoration hearing, one of which is Dr. Nazarino, who initially said he's fit and restored to fitness. And then they come back to the hearing, and after Mr. Bird cross-examines him, it ends up changing his mind. As Dr. Zoot points out in her testimony, there was no reevaluation by the doctor. There was no decision to take him back and talk to him again. It was just based on the snap decision based on what he was saying. In People v. Haynes, the Illinois Supreme Court pointed to a case involving where there were several experts saying the defendant was not competent, but there was one expert saying that he was competent. This is a similar situation here. We have several experts saying that Mr. Bird is incompetent, and we have Dr. Zoot saying he's essentially not making choices about what he's talking about, that he is competent and fit. And it is a matter for the trier of fact, in this case the judge, to decide whether or not he is fit. And Judge Erickson, actually, you asked how many pages, it was 12 pages in his decision. So he must be delusional because he goes on for a long time. Now, there is talk about the fact that if we go back and look at his original fitness hearing, which the jury said, yeah, we find him fit. Those were the same, other than the Nixon stuff, the same issues were litigated at that point. He said, I'm a concert promoter, I have a lot of music, I have all this thing going on, and the jury said, you're fit. Then when he starts coming up with this really irrelevant delusions, supposed delusions, we do know there is evidence that he was employed with the House of Representatives in the mail room. There were some pay stubs that were present. Now, everything else, his meeting with Nixon, if that happened or didn't happen, nobody can say. All the people that were at the meeting, except Mr. Berger apparently. You know, during the course of my somewhat lengthy lifetime, I have run into pathological liars. There's a possibility that people exaggerate and actually come to believe the exaggerated stories they tell over and over again, but does that amount to a severe mental illness, according to the experts that have testified in this case? Correct. As the experts alluded to the fact that he was delusional, Dr. Zoot testified that she noted that the people at Elgin never diagnosed him as suffering from a delusional disorder, only a reference to a bipolar mood disorder. So Elgin's diagnosis did not include any sort of delusions. Dr. Zoot testified that he did not have any, that he had a personality disorder and may have some delusions based on that, but again, it wasn't a severe mental illness that Edwards calls for. Edwards says you have to have, that is a prerequisite for denying a person his right to self-representation. And there's nothing, once the judge finds that she's going to rely upon Dr., or he's going to rely upon Dr. Zoot's testimony and upon his own experience, he's restored to fitness. No question was ever raised regarding whether or not he should represent himself. The judge went through all the admonitions of Mr. Bird, said hey, this is what should be, this is what's going to happen, I'm not going to give you any special treatment. I'm not going to, you know, you don't get any extra library privileges. And you have to understand that these issues, if you don't do these certain things, you're not going to be able to raise them on appeal. And Mr. Bird says, and everything indicates that he knows what's going on. Maybe he has these delusions, but the delusion about Nixon is really irrelevant to the case at hand. And his other delusions, alleged delusions, were not forced, were finding him unfit according to the jury. So there is no, once the judge finds that he is fit, there is no finding of severe mental illness. So the judge couldn't deny him his pro se rights to represent himself. I'm a little concerned about what happened with regard to the court's expert, Dr. Zhu. The same trial judge did not appoint a court expert in the first fitness hearing, nor in the second fitness hearing. But then when it came to restoration, and in mid-hearing, the judge elected to appoint a court's expert. Would you speak to that? And was that a little bit of overreaching by the court to support a result he wanted to get to? I do not believe so, Your Honor. And the basis of that is, when you look at Judge Erickson's comments during his decision, he's talking about how he respects the opinions of Dr. Simone and Dr. Baucus and Dr. Zut, and essentially saying, I didn't respect the opinion of Dr. Mazzarino. And the fact that he didn't like what Dr. Mazzarino was saying and the way he went about it, that's why he appointed Dr. Zhu. So I think that was not an overreaching, it wasn't a strange, out-of-the-blue decision to appoint somebody or seek a result. Thank you, that helps me. So, if there are, I don't think there's anything specific. If there aren't other questions, we'll stand on the reindeer of a brief and ask that the courts affirm the findings below. Just out of curiosity, have you ever seen a case where Dr. Zut found somebody unfit to stand trial? I cannot personally speak to that, though she said in her testimony that she has. So I can only rely upon her testimony on that point. If there are no further questions, thank you. Thank you. I just have a few points, Your Honors. First of all, just on the issue of relief and whether or not that would help Mr. Byrd at this point. Mr. Byrd, I have discussed the Mr. Byrd situation with Mr. Byrd. Mr. Byrd wants his new trial. So the relief is appropriate. Going to what Dr. Steyer, you asked me where the language was from Indiana v. Edwards. I have it at 554 U.S. at 177. I think I quoted at page 41 of my brief where the court talks about the injustice of leaving a mentally ill person on his own against the court. What page did you have it in? I'm sorry? What page was it? In the opinion it's 177, 554 U.S. at 177. On my brief, I quote it at page 41. Now, one thing I want to take issue with is Dr. Nazarino did diagnose the defendant from suffering from delusions. And did prescribe anti-psychotic medication to treat Mr. Byrd, which of course never was taken. So there is testimony from two doctors that he was delusional. One and three doctors that he had a personality disorder. And that's why I talk about Falcone v. State. I think Falcone v. State is an important case because under Falcone v. State, diagnosis of a personality disorder with two other doctors saying he's delusional as well, even if this court finds that he's fit and finds that the judge could rely on Dr. Zutz finding, although I still would maintain that Dr. Zutz finding is contrary to the manifest way of the evidence in this case, but even if this court credits that testimony or finds that the judge could credit that testimony, he could still find that the defendant was not able to perceive pro se under Indiana v. Edwards. Isn't that really what you need to have happen though? Because if we reverse the order finding he was restored to fitness, where does he go? If he was in custody, we transfer him back to a mental health facility. So are we going to yank him off the street and put him back at the Elgin Mental Health Facility? Well, I don't think you would immediately do that. Why not? Well, when these restoration proceedings were going on, he was actually in custody in jail. He left Elgin on his 365th day, which also happens to be the day that they declared him fit. Okay, so let's assume for the sake of argument I agree with you. He was not fit. The judge's order should be set aside. What do we do? It should be remanded for a new trial, which would necessitate a fitness hearing. There would have to be a fitness hearing. And if he's found unfit now, of course, he'd spend years. But if we reverse the court's order, he's unfit. Right. He's already been determined to be unfit. He would be presumed to be unfit. It would be a restoration hearing, actually. So he would start with the presumption that he's unfit, and then it would be his burden to show that he was not. That's right. I would obviously prefer the relief in Issue 2. But that's the situation with him. But he would also, during that proceeding, he would not be, he wouldn't just be swept into a mental health center. He would have to be actually found unfit or not restored before that would happen. As to, one other point I want to make, because it's kind of mentioned here during the counsel's argument, the timing of everything. There's a couple things here. The timing's a little bit, you don't want to impugn anybody, but the timing's just a little problematic. The appointment with Dr. Zoot, actually, it wasn't out of the blue. That's correct. It came in response to the state's motion to conclude the fitness hearing. And the state's motion to conclude the fitness hearing pointed out that, given that the expert opinion was, at that point, unanimous, there was case law that actually prevented the judge from finding the defendant to be fit. So the prosecutor and defense counsel at that point agreed that the hearing should end. Absolutely. And defense counsel and the prosecutor, all the way through these proceedings, both were in agreement that this defendant was not fit. And thank you. And it's also worth noting, and part of what makes the judge's finding regarding Dr. Nazarino's credibility a little, is the fact that Dr. Nazarino's opinion that the defendant became fit happened to be on the 365th day after the finding that he had been unfit. If you look at the statute, that was the deadline before he was going to have a discharge here. And if you look at the reports, he's not fit, he's not cooperating, he's not fit, he's not cooperating, all the way up until about a month before, and then you get this report on day 365. Mr. Hamel, I'd like to ask a question that isn't actually covered in the briefs, but it's normally when we talk about fit-to-stand trial, we're talking about a person who is capable of understanding the charges and cooperating with an attorney in mounting a defense. Have you found in your research anything that suggests that there should be a different standard when you're talking about actually representing yourself, rather than just assisting counsel? Well, that's kind of what Edwards gets into. Remember that this is really a new area of law, because up until Edwards, the fitness standard was the pro se standard, too, so it was always the same. And so there's not a whole lot out there yet defining this gray area. But one case, that's why I point this court to Falcone, I think is one really good case that does a good job of explaining what this term, severe mental illness, should mean, and how it applies practically to a defendant's ability to represent himself. But the basic idea, I think, that comes from Edwards and Falcone, and really any number of the cases that have come out since then, the basic idea is that they should be able to not prevent the case from devolving into some kind of sham or spectacle. And I think this case, that's what happened in this case. And the judge had a great deal of warning that this was going to happen in this case, because as I said, you have the nine months restoration hearing, and this defendant, he did it to the restoration hearing, he would just talk, and talk and talk and talk about all sorts of things, and it just wouldn't make sense, and his evidence didn't prove what he wanted it to prove, and then he finally gets through that, and the judge finds fit and allows him to go pro se, that exactly, that pattern just continued. And if you look at this, look at all sorts of things in this case, it's hard to remember everything, but if you look at his concert, when he comes in during the restoration hearing with this hand-burned CD, and sings along with it, to prove that he was a member of Kool and the Gang. When he does that, before he does that, I want to draw the court's attention to a comment made by defense counsel, because when he pipes up and says, you know, I still want to do this, and the defense counsel says, I want to hear this too, and I think I speak for the entire audience when I say that I want to hear this. So there's an audience there. Why is there an audience for a restoration hearing in a Class III felony case? Because of this, because this is devolved into this spectacle. There's all sorts of references throughout the trial, and I believe in the restoration hearing, to there being a reporter present. Thank you. Didn't the judge participate in that carnival-like atmosphere as well, by saying, you sound pretty good? I think he did, and I think that that added to the problem. It could have been your voice on the tape, I think the judge said, you sound pretty good, that might be you. Right, and I think defense counsel made a snide comment about his hand trombone technique. It was really, yeah, the judge's, and that's the problem here, it's the judge's job, the judge's job is to stop this. That happened before or after the court appointed the court's expert. That was actually right before the expert was testified. It was after the expert was appointed and right before she testified. There was several hearings in between. But the point is, that's the judge's job, is to stop that kind of thing and not encourage it. And Edwards, that's what any interview with Edwards gives him, that tool to do that, to put a stop to this kind of thing. Yeah, what I'm having difficulty with is your interpretation of Edwards. I mean, it's whatever the judge does that's wrong, based on what happens. You say you can represent yourself, and you lose, then it was a mistake. Well, I don't think, it's not unique in that there are plenty of issues out there where, from my perspective, I'm probably going, anytime it's close, that's probably going to happen. And the state's going to argue the other side. In Edwards, they say, we consequently conclude that the Constitution permits judges to take a realistic account of a particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is manly competent to do so. And then they go on to say that that is to say the Constitution permits states to insist upon representation by counsel for those competent enough to stand trial under dusky, but who still suffer from severe mental illness. So the conclusion here in this U.S. Supreme Court case is pretty broad. I mean, they give a lot of deference to the trial judge. They do, they do. What I imagine, the way I visualize this, there's a very narrow band of defendants, first of all, who Edwards is going to apply to at all. You have to be fit, and then you have to not be capable of representing yourself. And then within that band, what I'm talking about here is an even more narrow subset of that group of defendants who are so close to not being fit. My position really is he wasn't fit. But if you're finding that he's fit, he's so close to not being fit, and he's so likely to do exactly what he did here, that the judge's duty to protect his right to a fair trial is great enough that he must, the only way to do it is to force him to have counsel at that point. And my position is that in that situation, Edwards gives him that tool, and in that situation, he is obligated to use that tool. And the judge did not in this case. And unless Your Honors have any further questions, I don't really have much time. So thank you very much. Thank you. We will be taking the matter under advisement, and we will try without undue delay or many lengthy pages to issue an opinion quickly in this case.